# In the United States Court of Federal Claims

## No. 01-627C
### (Filed: December 29, 2011)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| **TIMBER PRODUCTS COMPANY,** | *   **Timber Sale Contract; Breach** |
|  | *   **of Implied Duties to Cooperate** |
| **Plaintiff,** | *   **and Not Hinder Performance;** |
|  | *   **Standard for Demonstrating** |
| **v.** | *   **Breach; Reasonableness of** |
|  | *   **Government Conduct.** |
| **UNITED STATES OF AMERICA,** | * |
|  | * |
| **Defendant.** | * |
|  | * |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

Ruth G. Tiger, Saltman & Stevens, P.C., Washington, D.C., for Plaintiff; Gary G. Stevens, Stacey A. Mescall, Saltman & Stevens, P.C., Of Counsel.

Tony West, Jeanne E. Davidson, Bryant G. Snee, Ellen M. Lynch, Joan S. Swyers, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for Defendant; Jamie Rosen, Department of Agriculture, Office of General Counsel, Washington, D.C., Of Counsel.

---

### ORDER AND OPINION ON LIABILITY

---

**WILLIAMS**, Judge.

This timber sale case comes before the Court after a trial on liability. [1] Plaintiff Timber Products Company ("Timber Products") claims that the United States Forest Service ("Forest Service") breached the implied duties to cooperate and not hinder performance by awarding a timber sale contract without performing environmental surveys. Specifically, Plaintiff claims that Defendant knew that its interpretation of law which led it to forego the surveys was unlikely to prevail in a pending District Court action, but failed to inform Plaintiff of this risk. Plaintiff claims Defendant breached its implied duties by awarding the contract and then suspending performance when the District Court litigants secured an injunction. Plaintiff filed a claim under the Contract Disputes Act seeking out-of-pocket expenses, as well as consequential damages representing the value of the timber lost or damaged due to the Government's suspension.

---

[1] By agreement of the parties, these proceedings were bifurcated into separate phases for liability and damages.

1

The Court finds that the Government acted unreasonably and breached its duties to cooperate and not hinder performance by awarding the timber sale knowing of the risk of an injunction and suspension, but never telling Timber Products. Because of these breaches, the Government's liability is not limited to out-of-pocket expenses.

## Findings Of Fact[2]

### The Northwest Forest Plan

On April 13, 1994, the United States Departments of Agriculture and Interior issued the Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl. Joint Stip. ("Stip.") ¶ 1; Joint Ex. ("JX") 6 at 7. The Record of Decision amended the Land and Resource Management Plans for federally owned lands in the Pacific Northwest, including the Klamath National Forest in California, which contained the Jack Heli timber sale area, the subject of this action. Stip. ¶¶ 2, 3, 5. The amended management plans are referred to collectively as the Northwest Forest Plan.

Land management plans such as the Northwest Forest Plan are administered pursuant to two statutes. First, the National Forest Management Act ("NFMA") requires the development of land management plans for national forests to "provide for diversity of plant and animal communities," 16 U.S.C. § 1604(g)(3)(B) (2006), and to comply with the requirements of the National Environmental Policy Act ("NEPA"). See 42 U.S.C. §§ 4321 et seq. (2006). Second, the Federal Land Policy and Management Act ("FLPMA") requires that land use plans "give priority to the designation and protection of areas of critical environmental concern." 43 U.S.C. § 1712(c)(3) (2006). All timber sales are required to be conducted consistent with such land management plans. 16 U.S.C. § 1604(i).

### The Requirement For Surveys of Certain Species Before Ground Distributing Activities Were Implemented

As part of the Northwest Forest Plan Record of Decision, a set of Survey & Manage ("S&M") Standards and Guidelines was developed with regard to habitat sites. See JX 6 at C-4 to C-6. The S&M Standards and Guidelines categorized the potential species to be protected, and established a corresponding survey strategy for each category of species indicating when and how surveys were to be conducted. JX 6 at C-4, C-49 to C-61. For Category 2 surveys -- the sole category of concern in this litigation -- the S&M Standards and Guidelines required surveys "prior to ground-disturbing activities." JX 6 at C-5. Category 2 surveys were initially required for approximately 76 species. JX 6 at 37, C-56 to C-61. These included the red tree vole, a type of lynx, five species of salamander, and other species ranging from lichens to mollusks and vascular plants. JX 6 at C-5, C-59 to C-61.

---

[2]   These findings of fact are derived from the record developed during the trial on liability. Unless otherwise noted, citations to the transcript are to the transcript of the trial.

Category 2 species were separated into two groups, each with a corresponding "trigger date," for performing surveys. Under the first trigger date, surveys within the known or suspected ranges of the red tree vole and salamander were required to precede the design of all ground-disturbing activities that were to be implemented in or after Fiscal Year 1997, which began on October 1, 1996. JX 6 at C-5. Under the second trigger date, Category 2 surveys were to be completed for the remaining species prior to ground disturbing activities that were to be implemented in or after FY 1999, which began on October 1, 1998. JX 6 at C-5.

## The Forest Service's Definition of Implementation

The Northwest Forest Plan was administered under an interagency hierarchy. The Survey and Manage Working Group ("S&M Working Group"), composed of representatives from the Forest Service, the Bureau of Land Management, and other agencies, was to coordinate the implementation of Northwest Forest Plan wildlife and plant surveys. JX 8 at A-37, A-42; Tr. 1072. The Issue Management Group, which included representatives of the Forest Service and Bureau of Land Management, was to act on recommendations for definitions, directions, and interpretations of the survey requirements under the Northwest Forest Plan when, in its view, such decisions could be made without going to the next higher level of authority. Tr. 1074-78, 1140. The highest level of agency authority within the Northwest Forest Plan was the Regional Interagency Executive Committee, which included the Regional Foresters of Regions 5 (California) and 6 (Oregon and Washington) of the Forest Service and the Director of the Oregon State Office of the Bureau of Land Management. Pl.'s Ex. ("PX") 13 at A-86; Tr. 864-66, 1075-76, 1210. Also reporting to the Regional Interagency Executive Committee, was the Regional Ecosystem Office, an interagency staff group that provided technical support and analysis, to the regional heads of federal agencies involved with the plan. Tr. 1086-87.

Beginning in August of 1996, the Issue Resolution Team members collaborated with the S&M Working Group in an effort to determine how the Forest Service and BLM would define the date of "implementation" for a given timber sale. PX 25, 27, 28, 30. The Record of Decision did not define the term "implement." Tr. 1092-93. Owen Schmidt, an attorney advisor for the Department of Agriculture Office of General Counsel ("OGC"), testified that "it's not a term of art that we were aware of. It's not a word that appears in the CFR's; hasn't been defined by the agency anywhere, and so the agency then is free to give it its own interpretation." Tr. 963.

The S&M Standards and Guidelines required that, surveys for the salamander and red tree vole species subject to the FY 1997 trigger date, had to "precede the <u>design</u> of all ground-disturbing activities that [would] be implemented in 1997 or later." JX 6 at C-5 (emphasis added). However, the Northwest Forest Plan Record of Decision did not mention "design," stating only that these species were to have surveys conducted prior to ground-disturbing activities that would be implemented in FY 1997 or later. JX 6 at 36.

## NEPA Decision Equals Implementation

On November 1, 1996, the Forest Service and BLM formally adopted what came to be known as the "NEPA Decision Equals Implementation" memorandum. PX 41 at A-276, A-279. In this memorandum, the Forest Service and BLM decided that the language in the S&M

3

Standards and Guidelines, rather than the Record of Decision, determined the applicability of the survey requirements -- i.e., that surveys had to "precede the design of all ground-disturbing activities" that would be implemented in FY 1997 or later.  PX 41 at A-279; Tr. 1119-20.  The Forest Service and BLM identified the date of design as the date on which a NEPA decision for the project site was issued.  A NEPA decision is the documentation a federal agency must "include in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment" concerning the environmental impact of that action.  42 U.S.C. § 4332(C)(i) (2006).  NEPA decision documents may take the form of (1) an Environmental Assessment or (2) a more detailed Environmental Impact Statement.  40 C.F.R. §§ 1508.9, 1508.11.  In adopting the "NEPA Decision Equals Implementation" memorandum, the Forest Service and BLM stated:

> The intention is to accomplish surveys prior to the design phase since the presence or absence of Survey and Manage species is a significant piece of information and should be available prior to the signing of the [NEPA] document.  The interagency interpretation is that the "NEPA decision equals implemented" in context to Component 2 species survey requirements.

PX 41 at A-279.  This meant that if a NEPA decision on a given timber sale had been issued prior to the Category 2 trigger dates, that timber sale would be exempt from the requisite surveys.  Thus, the Northwest Forest Plan Record of Decision was interpreted to mean that Category 2 surveys would not be required for timber sales where NEPA decision documents were signed prior to October 1, 1996, the start of FY 1997.  PX 41 at A-280.  Under this interpretation, where a NEPA decision had been made years before a timber sale, that NEPA decision was sufficient to permit going forward with the sale even though the surveys had not been done.

The Issue Resolution Team recognized that the "NEPA Decision Equals Implementation" interpretation would exclude more sales from the survey requirements initially.  Tr. 1194-95.  As an August 16, 1996 draft memorandum prepared by the S&M Working Group acknowledged:

> Selecting the NEPA decision point as the definition of "implementation" in the context of Category 2 S&M surveys also has the very pragmatic advantage of allowing projects for which we have NEPA decision completed prior to Sept. 30, 1996 but have not completed S&M surveys to move ahead in FY 97.

JX A-205.

Several Government officials expressed misgivings about the effects of adopting this interpretation.  Specifically, doubts arose as to whether the "NEPA Decision Equals Implementation" interpretation accurately reflected the intention of the Record of Decision or whether it was justifiable given the ordinary meaning of the term "implement."  PX 25 at A-209 to A-210.  These doubts were made known to Forest Service and Bureau of Land Management members of the Issue Resolution Team and other agency personnel.  Id.; see Tr. 1111-13, 1224-26, 2190-91.  Tom Hussey, a Forest Service Planner for the Pacific Northwest Region, acknowledged that "out of the context of the Northwest Forest Plan Survey and Manage

language I think most folks would say implementation occurs when you go out and actually do physical operations on the ground."  Tr. 1112.

Forest Service, Bureau of Land Management, and Fish and Wildlife Service officials also expressed concern that the adoption of "NEPA Decision Equals Implementation" would exempt some timber sales from Category 2 surveys.  PX 25 at A-209; PX 30 at A-223.  The S&M Working Group noted the "NEPA Decision Equals Implementation" interpretation could produce "possible resource damage."  PX 25 at A-209.  In assessing the possible adverse consequences of exempting timber sales from Category 2 surveys, Richard Holthausen, the former head of the Species Analysis Team, stated that there was no way of knowing which species might have a higher likelihood of experiencing a negative impact by delaying the Category 2 surveys, but that delaying the Category 2 surveys would undoubtedly have some level of adverse effect on some subset of species.  JX 3 at 341, 356-58. [3]

The "NEPA Decision Equals Implementation" memorandum, as first issued, applied only to the FY 1997 trigger date.  PX 41 at A-279 to A-280.  However, on September 11, 1998, the Forest Service and BLM extended the "NEPA Decision Equals Implementation" interpretation to apply to surveys subject to the FY 1999 trigger date.  PX 60 at A-366.  The Jack Heli sale at issue in this case was exempted from surveys under the "NEPA Decision Equals Implementation" interpretation because the NEPA decision document for Jack Heli was signed on July 14, 1998, -- before the FY 1999, or October 1, 1998, trigger date.  PX 217.

**The ONRC Action Litigation**

After the Forest Service adopted the "NEPA Decision Equals Implementation" interpretation, various environmental groups and members of the public began filing comments and administrative appeals of NEPA decision documents that did not include Category 2 surveys.  On July 8, 1998, Oregon Natural Resources Council Action ("ONRC Action"), an environmental advocacy group, filed a lawsuit in the United States District Court for the Western District of Washington, Judge William Dwyer presiding.  Stip. ¶ 15; ONRC Action v. U.S. Forest Serv, 59 F. Supp. 2d 1085 (W.D. Wash. 1999).  The plaintiffs challenged, among other things, the Forest Service's adoption of "NEPA Decision Equals Implementation" and the interpretation's consequences for various proposed timber sales in the Pacific Northwest.

Shortly after the filing of the lawsuit, Susan Zike was assigned as the Forest Service's Litigation Coordinator for the case. [4]  Ms. Zike was tasked with preparing briefing papers for senior executives in the Forest Service, to provide information on the progress of the ONRC

---

[3] Mr. Holthausen did not testify in this action, but his testimony from the Scott Timber Company v. United States, No. 05-808C, trial on liability, was admitted into evidence in this case as Joint Exhibit 3.  See Scott Timber Co. v. United States, 86 Fed. Cl. 102 (2009).

[4] Ms. Zike has served as the Regional Litigation Coordinator for the Pacific Northwest Region (Region 6) of the Forest Service in Portland, Oregon since 1991.  Ms. Zike received her Juris Doctor from the Northwestern School of Law, Lewis and Clark College, in 1990.  Tr. 389-90; PX 190 at 4.

Action suit and to make or pass on recommendations to these executives. Ms. Zike provided information from the Forest Service to the Department of Justice ("DOJ") attorneys handling the ONRC Action litigation and acted as a conduit of information between DOJ and the Forest Service. PX 190; Def.'s Ex. ("DX") 171; Tr. 392-95.

**The ONRC Action Plaintiffs' Lists of "At Risk" Sales Provided to DOJ**

As early as July 1998, the ONRC Action plaintiffs began providing the Government with lists of "at-risk" or "problem" timber sales, which, in their view, violated the survey requirements of the Northwest Forest Plan and needed to be halted until such requirements were met. PX 55; 56 at A-361. The purpose of these lists was to put the Forest Service on notice that if it awarded any of the listed sales or allowed any ground-disturbing activities on their areas, ONRC Action might seek a temporary restraining order ("TRO") or preliminary injunction ("PI"). Id. These lists were exchanged between the parties to ONRC Action and were not made public. The Forest Service maintained a policy of keeping the "at-risk" lists and its negotiations with ONRC Action plaintiffs confidential, as they were part of ongoing settlement discussions with the plaintiffs. PX 56 at A-361; PX 59; PX 75 at A-434; PX 87 at A-475; PX 88 at A-487; DX 171 at 171/1; Tr. 134-35, 407, 477. However, DOJ requested that the Forest Service inform bidders generally of the ONRC Action litigation when opening the sale to bids. PX 56 at A-351.

On July 28, 1998, Jack Heli was listed along with the original 32 timber sales identified by the ONRC Action plaintiffs as allegedly violating the survey requirements of the Northwest Forest Plan. PX 53 at A-339.

On August 26, 1998, as part of an effort to settle the case, counsel for the ONRC Action plaintiffs provided DOJ with a list of over 300 timber sales which, in their view, "need[ed] to be withheld from award pending our negotiations." PX 55 at A-351. The Jack Heli timber sale contract was listed under a category of 177 sales described as:

> Sales with unknown auction dates. If these turn out to have auction dates in calendar year 1999, no immediate agreement would be necessary, since we should know before then whether a more permanent agreement is possible, and they would be subject to that agreement."

PX 55 at A-351, A-354. The letter stated further that "[a]s more information comes to light regarding specific sales, the lists may change over the next month or so." PX 55 at A-352.

On September 17, 1998, the Forest Service received a letter from the plaintiffs in the ONRC Action lawsuit indicating that they had dropped Jack Heli timber sale from their list of "at-risk" sites. DX 46 at 107. The letter did not explain why Jack Heli or other sales had been dropped. The Forest Service's Contracting Officer ("CO") for Jack Heli, Ed Matthews, testified that at the time the Jack Heli timber sale was offered, "[the ONRC plaintiffs] had sent us a document that indicated that they were dropping the sale" from their list of at-risk sites that could prompt a PI or TRO. Tr. 1813.

**The Jack Heli Contracting Process**

On September 25, 1998, the Forest Service advertised the Jack Heli sale.  PX 219, 219A.  At that time, Jack Heli was still not listed as an "at-risk" sale in the <u>ONRC Action</u> litigation.  Tr. 1816-17.

The bid package for Jack Heli included a prospectus, bid forms, and a Sale Area Map, and the Forest Service made available a sample contract.  Tr. 1411-12, 1558-60, 1771-75, 1781-82, 1905-07.  The prospectus for Jack Heli alerted potential bidders to the <u>ONRC Action</u> litigation, stating:

> This sale has been identified in a lawsuit in which plaintiffs contend that [the Forest Service] has violated the Northwest Forest Plan in preparing the sale.  Language in this sales contract has been included to limit Government's liability in case of cancellation to the holding costs.

PX 219 at 422; Tr. 1408-09, 1560-61.

The bid opening and oral auction for the Jack Heli timber sale did not occur until November 3, 1998.  Stip. ¶ 11.  Timber Products was the high bidder for Jack Heli.  However, as CO Matthews testified, the contract was not immediately awarded because "it takes a few days to pull it together after we've opened the bids and get the package ready, and that's when we got the letter saying that we needed to wait."  Tr. 1815.

**Delay of the Jack Heli Award**

The Forest Service planned on awarding the Jack Heli sale to Timber Products on or about November 10, 1998.  <u>Id.</u> at 1823.  However, on November 9, the <u>ONRC Action</u> plaintiffs notified the Government that they had erroneously removed Jack Heli from the "at-risk" list and asked that the Forest Service "let [ONRC Action] know immediately if there will be a problem with including Jack Heli among the sales which [the Forest Service] will hold off awarding until November 23."  DX 47.  DOJ in turn requested that the Forest Service not award Jack Heli.  Tr. 1827; PX 193 at 13-14.  On November 24, 1998, CO Matthews asked Bev Cox, a contract specialist for the Forest Service, to call Bill Turner, Timber Products' Timber Procurement Manager, and notify him that the Forest Service could not make award of Jack Heli "until the Justice Department says we can."  PX 232 at 2372; Tr. 1907-09, 1844-45.  Ms. Cox conveyed this message to Mr. Turner that same day.  Tr. 1907-08; PX 232 at 2372.

**Efforts to Settle ONRC Action**

Government and ONRC Action attorneys were engaged in formal settlement discussions from July 1998 to December 1998.  <u>See e.g.</u>, PX 51, 53, 55, 56, 65, 73, 87, 87B 88, 90, 92A, 95, 96; DX 171.  The Government wanted to avoid motions for injunctive relief prior to obtaining a final decision on the merits so as not to disturb sales or interrupt the briefing schedule for filing a motion for summary judgment.  PX 163A at 1352, 1354; Tr. 128, 145-46, 427-30, 528-31.  One of the <u>ONRC Action</u> plaintiffs' principal demands was that the Forest Service and BLM conduct

Category 2 surveys for all unawarded timber sales that had NEPA decision documents issued in the last quarter of FY 1998, i.e., on or after July 1, 1998.  See PX 65 at A-378; PX 87 at A-475; PX 88 at A-488, A-490; PX 96 at A-499, A-502; DX 171 at 171/1.  The Government objected to this demand due to the costs of conducting the surveys and the impact that conducting the surveys would have on the Forest Service's FY 1999 timber sales.  See PX 88 at A-488, A-489; PX 90 at A-502; DX 171 at 171/1-2.  The Jack Heli sale fell within the scope of the ONRC Action plaintiffs' settlement demand, as its NEPA decision had been issued on July 14, 1998.

On September 25, 1998, the same day the Forest Service advertised the Jack Heli sale, the ONRC Action plaintiffs submitted a settlement proposal to DOJ.  PX 65 at A-373; Tr. 1816-17.  This proposal demanded that surveys be performed for all "at-risk" sites prior to award, meaning all sites which were named on the ONRC Action plaintiffs' list.  At that time, however, Jack Heli was not among the listed sales.

On October 26, 1998, in a settlement counter-offer to ONRC, DOJ pledged not to award any of the implicated timber sales until November 23, 1998.  PX 73 at A-431.  On October 28, 1998, Ms. Zike informed her contacts in the Forest Service that if sales were to proceed on any of the implicated timber sales, "good reasons" would have to be shown and DOJ would have to approve.  PX 75 at A-434.  Specifically, Ms. Zike stated:

> DOJ is likely to encourage us to delay the upcoming awards of any sale on the chart, unless we can show good reasons (resource reasons) why the sale needs to be awarded within the next month.

Id.  Mr. Schmidt, an Attorney Advisor for the Department of Agriculture, commented, "if you want to take the least risky path, do not award a sale during the pendency of litigation."  Tr. 952-53.

Government officials continued to discuss the validity of the "NEPA Decision Equals Implementation" interpretation and the Government's ability to successfully defend the interpretation in the context of the ONRC Action litigation.  On or about November 25, 1998, Ted Boling briefed Assistant Attorney General Lois Schiffer and Deputy Assistant Attorney General Peter Coppleman on the ONRC Action allegations regarding the "NEPA Decision Equals Implementation" interpretation.  Tr. 62.  Mr. Boling believed that the Record of Decision was ambiguous as to the definition of "implement" and "could be read as supporting a pre-decisional or post-decisional approach."  PX 90 at A-502; Tr. 173-80.  He testified that, "[t]he Agency's interpretation of the ROD is difficult to square with the common meaning of the term implement."  Id. at 173.

Assistant Attorney General Schiffer voiced concerns regarding the defensibility of "NEPA Decision Equals Implementation."  Tr. 175.  Assistant Attorney General Schiffer said that the agency's definition of "implement" was "nonsense."  PX 89 at A-498.[5]

---

[5]   Ms. Schiffer did not testify at trial, and neither party entered her deposition into evidence.  This finding is derived from Ms. Zike's testimony referring to a contemporaneous note recording a conversation among Ms. Schiffer, Mr. Boling and Ms. Zike and another undated

On November 28, 1998, the "NEPA Decision Equals Implementation" interpretation was upheld by the Interior Board of Land Appeals ("IBLA") in In re North Murphy Timber Sale, 146 IBLA 305 (1998).[6]  In that case, the Interior Board of Land Appeals stated:

> As a general matter, we would be inclined to agree with appellants that ground-disturbing activities are 'implemented' when they, in fact, occur.  However . . . there is a latent ambiguity within the [Northwest Forest Plan] as to the proper interpretation of the 'implementation' concept.

146 IBLA at 332.  The Board concluded, "While the matter is clearly not free of controversy or doubt, we will defer to the interpretation of 'implemented' promulgated by [the 'NEPA Decision Equals Implementation' Memorandum]."  Id. at 333.  In Mr. Boling's words, the North Murphy decision "came out strongly and independently in favor of the Agency interpretation" of the Record of Decision.  Tr. 221.

The Government's October 26, 1998 counter-offer not to award any of the implicated timber sales until November 23, 1998, expired on November 20, 1998, and was later extended until December 3, 1998.  PX 73 at A-427, A-431, A-432; PX 92 at A-507.  Ms. Zike concluded that the Forest Service was free to award contracts but should give DOJ at least five days notice.  PX 96 at A-517.

On December 2, 1998, the CO notified the Region 5 Forest Service office via email that he was planning to award Jack Heli on December 18, 1998.  PX 96 at A-518; Tr. 1608-09, 1839-41.  At that time, Mr. Matthews understood that the settlement agreement that prohibited the Forest Service from making awards on "at-risk" sales had expired, rendering the Forest Service free to award Jack Heli to the winning bidder, Timber Products.  Tr. 1840-42.

Just before December 3, 1998, when settlement with the ONRC Action plaintiffs did not appear likely, Ms. Zike emailed her distribution list (which included Ed Matthews, Brian Stone, ONRC Action litigation coordinator for Region 5, and high level Forest Service officials), the following warning: "Please keep in mind (as CO's always do) the liability that may come to the [Forest Service] if the sales are awarded and then enjoined."  PX 95 at A-516; Tr. 532-34.

On December 4, 1998, Mr. Boling informed Ms. Zike by letter that "we have no agreement with plaintiffs to hold on to the award of any timber sales.  Therefore, the Forest

---

note taken after conversations with Ms. Schiffer.  Ms. Zike wrote that Ms. Schiffer referred to the interpretation of implement as "nonsense" twice.  PX 91 at A-504; Tr. 508-10.

In response to questioning on the substance and accuracy of Ms. Zike's notes, Ms. Graybeal, the Associate Deputy Chief of the Forest Service, stated: "Well, again, that's exactly what it says, and I have no reason to question Sue [Zike] would do anything other than accurately convey that."  Tr. 876-78.

[6]  The Interior Board of Land Appeals is an appellate review within the Department of the Interior.  See 43 C.F.R. § 4.1(b)(2).  The Board's administrative judges decide appeals from bureau decisions regarding the use and disposition of public lands and their resources.  43 C.F.R. § 4.1(b)(2)(i).

Service and BLM are free to award pursuant to applicable law and exercise of sound discretion."
PX 96 at A-519; Tr. 154-55.  Mr. Boling requested that the Forest Service keep DOJ informed of
pending timber sale awards, "particularly the date on which the agency [was] in fact going to
award."  PX 96 at A-519 to A-520; Tr. 156.  Mr. Boling concluded:

> Forest Service and BLM should tell us that date after 1) having reviewed the
> issues common to the administrative appeal and the ONRC Action suit with
> agency counsel . . . , 2) communicated to us its judgment that the award of the
> sale is worth the risk that the sale will be used by plaintiffs as an example in an
> emergency motion to enjoin all sales in the area of the Northwest Forest Plan, 3)
> compiled the essential elements of the administrative record that we will need to
> defend against . . . such a motion . . . and, 4) completed all contracting
> prerequisites.

PX 96 at A-519 to A-520.  Mr. Boling further requested notice of five business days before
award. PX 96 at A-520.  Mr. Boling testified that he expected the agency to make the decision to
award:

> Q.    Were you looking for Forest Service counsel to convey to you his
>       judgment about the strength of the case on an individual timber sale?
>
> A.    We wanted them to communicate to us their case as we could present
>       it to Judge Dwyer.
>
> Q.    Okay.  And do you conduct your own risk assessment?
>
> A.    I don't see any indication of that in this letter, and frankly this is written
>       in terms of give us prior notice, tell us.  I don't see any indication in here
>       that we were trying to intrude or interpose ourselves in the Agency's
>       decision making.
>
> Q.    Okay.  So you expected the Agency to make the decision that going
>       forward with award of the sale was worth the risk that it might be used as
>       an example in an injunctive action?
>
> A.    Amongst other reasons, yes.
>
> Q.    What other reasons?
>
> A.    Well, the other reasons identified in here.

Tr. 157-58 (referencing PX 96 A-519 to A-520).  The only "other reasons identified in here," i.e.,
in the December 4 letter, were the prerequisites the agency had to accomplish before deciding to
award.  PX 96 at A-519 to A-520.

In a December 7, 1998 email, Ms. Zike informed Forest Service personnel that she would be sending them a form to use to analyze the advantages and risks of awarding any timber sales, and explained the criteria for a sale to be in a "strong[] litigation position," stating:

> [t]he form will be based on the 5 points[7] DOJ Boling made in his 12/4/98 letter to me that I told you about Friday. . . . I think it is prudent that we determine which sales put us in the strongest litigation position in this case.  If we are to argue that sale complies with the ROD, it seems like we should be very sure that the NEPA is very good, the [Decision Notice] is well-reasoned; the compliance with the ROD is well-explained; and the S/M requirements are clear and our compliance is tidy!

PX 97 at A-521.

On December 8, 1998, Ms. Zike sent another email to her list of Forest Service officials informing them that DOJ agreed to defend the "NEPA Decision Equals Implementation" decision.  PX 99A at Tab 8-0069.  On December 11, 1998, Ms. Zike provided a chart to the Forest Service officials for a comparison of common issues between ONRC Action litigation and any administrative appeals per Mr. Boling's request.  PX 101 at A-598 to A-599.  The completed chart indicated that for the Jack Heli sale, the surveys required by the Northwest Forest Plan under the "NEPA Decision Equals Implementation" interpretation had been performed, and that the Jack Heli sale complied with survey requirements as of November 1, 1996.  PX 101 at A-602.  Ms. Zike informed the Forest Service officials that the risk assessment would be coordinated between the Office of General Counsel and DOJ.  PX 101 at A-601.

In a memorandum to Regional Forester Williams and BLM State Director Zielinski dated December 9, 1998, Ms. Zike analyzed the pros and cons of awarding any of the sales ONRC Action named as examples of sales violating the Northwest Forest Plan survey requirements.  PX 99 at A-1754.  Under the "pro" column, Ms. Zike stated that proceeding with sales "put[] purchasers squarely on the table."  PX 99 at A-1754; see Tr. 557.  Ms. Zike testified that the Forest Service could gain a "litigation advantage" with respect to any motion for preliminary injunction by proceeding with the sales.  She explained that the Government could not present arguments about the harm to the purchasers that would result from an injunction, but once a sale was awarded, the awardee would be involved in the litigation and could better attest to financial harm, harm to capital investments, and harm to their businesses.  Tr. 556-57.  One of the "cons" identified by Ms. Zike was that going forward with the sale might subject the Government to liability for contract damages if the Forest Service were to award the contracts only to have them enjoined.  PX 99 at A-1754; Tr. 556-58; see also PX 95 at A-516.  Specifically, Ms. Zike stated that awarding sales "may create $$ liability to government if [we] lose [the] case."  PX 99 at A-1754.

On December 13, 1998, Mr. Matthews provided the requested "5-day notice" via e-mail to DOJ of intent to award the Jack Heli sale.  Tr. 1820, 1838-39; PX 96 at A-518.  However, Mr.

---

[7]  This appears to be a typographical error in Ms. Zike's email as Mr. Boling's letter, PX 96 at A-519 to A-520, only contains a numerical list of four points.

Matthews received a response from DOJ directing him <u>not</u> to award on December 18 due to ongoing settlement negotiations with the <u>ONRC Action</u> plaintiffs. Tr. 1840. Mr. Matthews did not award the sale at that time.

On January 22, 1999, Paul Brouha, Associate Deputy Chief of the Forest Service, sent a memorandum including background and analysis of the <u>ONRC Action</u> litigation to high level officials in the Department of Agriculture and Forest Service in Washington D.C., with a copy to the acting chair of the President's Council on Environmental Quality. PX 109 at 1795.[8] Under the heading "What are the contracting implications of surveying awarded sales?" the memorandum stated:

> The agencies would argue vigorously against surveying sales that have been awarded. The Forest Service has no provisions in its timber sale contracts that specifically allow for suspension for survey and/or discovery of survey and manage species. The "Protection of Habitat of Endangered, Threatened, and Sensitive Species" clause (C6.25#) only includes those species listed as Threatened, Endangered, or Sensitive (Regional Forester's list). None of the survey and manage species are on the Threatened & Endangered list and many are not on the Sensitive List. A contract modification under this subsection would require reimbursement to the purchaser.

PX 109 at 1798.

In an email exchange with Sue Zike dated January 22, 1999, Brian Stone, the Region 5 litigation coordinator for the <u>ONRC Action</u> lawsuit, informed Forest Service COs and others on his distribution list, including CO Matthews, that "[t]he question needs to be answered for each sale that would go forward: Why do we need to go forward with this particular sale NOW, instead of waiting for conclusion of the ONRC litigation??" PX 110 at A-577.

The Jack Heli sale remained delayed through January 1999. Because the Jack Heli bid form required that the purchaser's bid remain valid for 90 days and the 90-day period was about to end, Ms. Cox notified Bill Turner on January 29, 1999, of the need to extend Timber Products' bid so it would not expire. PX 219A at 2351; PX 222. On February 1, 1999, Mr. Turner requested that Timber Products' bid be extended. JX 13. Mr. Turner did not put an end date on the extension, but did not recall why at trial. He testified that he may have understood that Jack Heli would be released from whatever was holding up award of the sale: "Ed Matthews may have represented to me at this time on a conversation that, hey, it's almost ready to be released." Tr. 1565-66.

By email dated February 6, 1999, Ms. Zike provided her distribution list with a "rough draft of the chart of proposed sales to award in the <u>ONRC Action</u> case." PX 112. She stated,

---

[8] Although this memorandum was privileged, the Government waived the attorney client privilege by including the memorandum in the Administrative Record of another lawsuit. <u>Blue Lake Forest Products, Inc. v. United States</u>, No. 01-570C, 2007 WL 5161595, *1, n.1 (Fed. Cl., March 29, 2007) (Opinion and Order Based on In Camera Review).

"I'm thinking our window of opportunity is opening up, and I want us to be ready."  PX 112; Tr. 595-96.  In the attached memorandum, dated February 2, 1999, Ms. Zike listed six sales -- including Jack Heli -- recommended for award.  PX 112 at 0223; see also PX 112A at Tab 8-0090.

With regard to the perceived "window of opportunity" within which to award the sale, Ms. Zike testified:

> [W]e had prevailed on our motion to dismiss for failure to state any timber sales in their first complaint.  So we won our first motion to dismiss.  So there was an opportunity before the amended complaint comes in that we would not have the risk of prompting a motion for preliminary injunction until they got their amended complaint in the hopper.  So that was our what I perceived anyway to be a window.

Tr. 595.

In a February 26, 1999 memorandum to Ted Boling, Ms. Zike recommended Jack Heli for award.  DX 18 at 4-5; Tr. 607.  Though Ms. Zike conveyed the decision to award Jack Heli in her role as litigation coordinator, she personally opposed award because of the risk of a lawsuit and an injunction interfering with the sale, but she was alone in that view among the group.  Id. at 607-13.

## The Jack Heli Award:  March 2, 1999

On March 1, 1999, Ted Boling wrote to Michael Axline, lead counsel for ONRC Action, to provide him with information regarding "certain timber sales that may be of concern to your client," specifically, that BLM and Forest Service planned to award various timber sales after March 1, 1999, beginning with Jack Heli, Klamath. PX 202. Ms. Zike informed her distribution list that the Forest Service was proceeding "even though there [was] some risk of prompting a preliminary injunction with the awards."  DX 18 at 18/1.  Ms. Zike noted that the Jack Heli award had been ready for at least a week, but that the Forest Service did not intend to make any awards without approval from DOJ.  Id.  Since settlement discussions with ONRC Action plaintiffs had first collapsed in December of 1998, it had been the Forest Service's practice to inform DOJ attorneys of its intentions before awarding a sale implicated by ONRC Action.  Tr. 600.  If DOJ had "grave concerns" about a decision to award, the Forest Service "would certainly take that into consideration."  Id. at 600-01.

On March 2, 1999, the Forest Service formally awarded the Jack Heli sale to Timber Products.  JX 14, 15; PX 227; Stip. ¶ 12.  The contract covered timber at 25 locations or "units" across the Scott River Ranger District of the Klamath National Forest, totaling 1,650 acres.  JX 15 at 5, 35, 103.  In making the award, the contracting officer issued his standard contract award letter to Timber Products.  JX 14; Tr. 1444-45, 1835-36.  The Forest Service's report about the Jack Heli timber sale award, Form FS-2400-17, noted that contract award was "made upon approval of [the] Department of Justice."  PX 227.

13

**Timber Products' Knowledge of the ONRC Action Litigation**

Beginning in August of 1998, the CO discussed the ONRC Action litigation and its potential impact on sales like Jack Heli with designated representatives of Timber Products and other members of the industry. Tr. 1810-12. The CO testified:

> It was fairly early on in the litigation, and I was starting to see the magnitude of the case. I had called [Mr. Turner] and asked him if he knew about the case. I said it looks like it was really challenging our timber sale program. Bill [Turner] was kind of the local rep there for the industry group that set up some of our meetings, and in the course of conversation he had mentioned that he was aware of the case and had received some information from the attorney that industry had involving the case.

Id. at 1810. Mr. Matthews recalled that "[t]hat was just one of several calls, but that seemed to be pretty good information that he was aware of what was going on." Id. In addition to those calls, the CO attended quarterly breakfast meetings during which the ONRC Action litigation was discussed. Tr. 1534-36, 1811-12, 1885-86. There is no evidence that CO Matthews or any other Government personnel revealed confidential ONRC Action settlement negotiations or shared the at-risk lists with Timber Products at any time.

On or about November 24, 1998, Mr. Turner requested a copy of the complaint in the ONRC Action case. Tr. 1531. The ONRC Action complaint requested that the district court "[e]njoin Defendants from undertaking activities that do not comply with the ROD," and order the Defendants to comply with enumerated statutes. Pl.'s Notice, Attach. 1, at 19, ECF No. 274. The complaint made no mention of any particular timber sales Plaintiffs sought to enjoin. Mr. Turner testified that he requested the complaint "[j]ust to read what it was about. I couldn't affect that [litigation]. . . we weren't the ones involved in this suit and just to read it." Tr. 1568. He did not follow up or seek additional information on the status of the suit. Id. at 1531-32, 1920-24.

Timber Products belonged to five timber and forest industry trade groups that provided frequent newsletters and briefings on various aspects of the industry: the California Forestry Association, the Southern Oregon Timber Industry Association, the American Forest and Paper Association, the Federal Timber Purchasers Committee, and the Hardwood Plywood Association. Id. at 1552. Mr. Turner testified that these trade groups typically "represent[ed] the member companies and inform[ed] them of issues that would pertain to [their] business," and would intervene in environmental lawsuits on behalf of their members. Id.

Mr. Turner believed that information regarding the ONRC Action lawsuit and its progress likely appeared in one or more of the newsletters published by those trade groups. Id. at 1571-72. There is no evidence that these newsletters revealed the confidential settlement negotiations or any information that certain sales were at risk for an injunction.

During the period between December 1998 and March 1999, Mr. Turner had several conversations with CO Ed Matthews about the status of Jack Heli. Tr. 1428-33, 1436-38, 1928-

29.  On January 10, 1999, Mr. Turner asked CO Matthews for a "formal communication as to what the Forest Service expectations [were] for award of this sale."  JX 12.  Mr. Matthews responded by letter of January 21, 1999, acknowledging that Timber Products "need[e]d to know soon so that [it could] finalize scheduling a helicopter to harvest the sale this field season."  PX 221.  The contracting officer's letter continued:

> The forest is presently preparing information documents for presentation to government attorneys indicating that we want to proceed with award of the sale. It is also my understanding that government attorneys have filed for dismissal of the case.  At this time, I do not know when award of the sale will be approved but I do not expect to have anything resolved before early February.

PX 221.

Mr. Turner understood from CO Matthews' January 21, 1999 letter and his other communications with CO Matthews and Contract Specialist Cox that "they were getting this timber sale removed from the lawsuit" and "were trying to remove this sale from the lawsuit and would not award it until it was removed."  Tr. 1432-33, 1564.  Ms. Cox was not familiar with the ONRC Action litigation and never told Mr. Turner that the Jack Heli timber sale was at risk in the ONRC Action lawsuit.  Tr. 1909.

> In describing his understanding of the contract, Mr. Turner testified:

> The Forest Service is representing that they've done all the work necessary to allow us to harvest the timber from the timber sale, and that's why they went about selling it at that point.  And the delay in the award was because they were still dotting I's and crossing T's.  But the contract as a whole speaks to the fact that now you can go ahead, Timber Products Company, and operate this timber sale.

Tr. 1545.

## The Contract

The contract specifications identified which timber could be harvested and specified methods of logging in each unit.  In particular, the contract designated the manner in which timber could be harvested, the time of year during which operations could be conducted, the timing and locations where logging could take place, and which roads could be reconstructed and used.  See JX 15 at 449/8, 449/26, 449/34, 449/41-48, 449/52, 449/54, and 449/76-102.

The contract included several clauses that governed liability and title to the timber. Contract clause B8.11, "Title Passage," provided:

> All right, title, and interest in and to any Included Timber shall remain in Forest Service until it has been cut, Scaled, removed from Sale Area or other authorized cutting area and paid for, at which time title shall vest in Purchaser.  . . . Title to

any Included Timber which has been cut, Scaled and paid for, but not removed from Sale Area or other authorized cutting area by Purchaser on or prior to Termination Date, shall remain in Forest Service.

JX 15 at 449/30.

Contract clause B8.12, "Liability for Loss," provided:

If included Timber is destroyed or damaged by fire, wind, flood, insects, disease or similar cause, the party holding title shall bear the timber-value loss resulting from such destruction or damage, except that such losses after removal of timber from Sale Area, but before Scaling, shall be borne by Purchaser at Current Contract Rates and Required Deposits.  There shall be no obligation for Forest Service to supply, or for Purchaser to accept and pay for, other timber in lieu of that destroyed or damaged.  This Subsection shall not be construed to relieve either party of liability for negligence.

JX 15 at 449/30.

In addition, the contract included provision B8.21, which allowed for a Contract Term Adjustment ("CTA" or "adjustment") if the Forest Service requested an interruption or delay of operations of more than 10 days.  JX 15 at 449/30.  Clause C6.01, the limitation of liability clause, stated in pertinent part:

Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:

\* \* \*

(b) To comply with a court order, issued by a court of competent jurisdiction;

\* \* \*

Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (i) Contract Term Adjustment pursuant to B8.21, or (ii) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to B8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision.  Out-of-pocket expenses do not include lost profits, attorney's fees, replacement cost of timber, or any other anticipatory losses suffered by Purchaser.  Purchaser agrees to provide receipts or other documentation to the [CO] which clearly identify and verify actual expenditures.

JX 15 at 449/49.

**The Post-Award Period**

After award, Timber Products undertook preparations to operate the sale. Timber Products participated in a pre-operations meeting with the Forest Service on April 6, 1999, in order to begin the road reconstruction that was a required part of its contract performance. JX 15 at 449/43-44; PX 129 at A-990; 330; Tr. 626-28, 1446-48, 1862-65. On or about June 18, 1999, Timber Products' subcontractors finished the actual road reconstruction work. See JX 26 at 2558.

In the spring and summer of 1999, Timber Products was conducting non-ground-disturbing road operations, and logging on Jack Heli was not anticipated until September 1999. PX 330 at GO5-0016-0547; Tr. 626-28, 1862-65.

On July 9, 1999, Sue Zike informed her distribution list that if logging operations were to be approved on Jack Heli, both DOJ and the Department of Agriculture's Office of General Counsel needed to be notified as soon as possible because such operations were "likely" to trigger a motion for TRO or a PI from the ONRC Action plaintiffs. PX 141 at A-1099.

On August 13, 1999, after road construction work was substantially complete, Timber Products participated in another pre-operation meeting with the Forest Service in order to begin logging operations. PX 229; Tr. 1449-53. Timber Products' subcontractors began felling timber on or about August 14, 1999. Tr. 1462-63. Felling timber normally precedes helicopter logging by about one or two weeks for safety reasons. Id. at 1453. The Forest Service was aware that these activities were taking place. JX 26, Tab D at 2621; Tr. 1449-52.

**Developments in ONRC Action After Award of the Jack Heli Sale**

On March 26, 1999, the parties in ONRC Action entered into a stipulation "to facilitate the briefing period and avoid TRO/PI interruptions" between April and June. PX 129. The parties agreed that the Government would provide 10 days notice before approving a plan of operation for nine projects named in the complaint, and before awarding any sales identified by the ONRC Action plaintiffs named as "problem sales" in early April. This provision was set to expire on June 15, 1999. PX 129.

In an April 12, 1999 letter to attorney Boling, the ONRC Action plaintiffs listed Jack Heli among 45 sales "at risk of being awarded and operated prior to June 1, 1999," the date that summary judgment motions would be completed and ready to argue. PX 203 at A-756 to A-757; Tr. 193-97.

On July 6, 1999, ONRC Action submitted a revised list of sales "at risk" of being awarded or operated prior to a ruling on pending summary judgment motions. PX 128 at A-979; see PX 129. This new list again named the Jack Heli sale. PX 128 at A-981.

On August 2, 1999, the District Court granted summary judgment in favor of ONRC Action and enjoined the Forest Service from allowing operations on nine specified timber sales; Jack Heli was not among the sales on this "smaller" list. PX 143. The court determined that the

Forest Service had failed to comply with the Northwest Forest Plan's survey requirements for 77 Category 2 species, including the red tree vole. <u>ONRC Action v. U.S. Forest Serv.</u>, 59 F. Supp. 2d 1085, 1092-94 (W.D. Wash 1999); <u>see</u> PX 143 at 7, 9. In particular, the court found that "[a]gency actions exempting timber sales from the plan's category two survey requirements by equating 'implemented' with 'NEPA decision' are unlawful and must be set aside under the [Administrative Procedure Act (APA)], 5 U.S.C. § 706(2)(A)." <u>ONRC Action</u>, 59 F. Supp. 2d. at 1094; <u>see</u> PX 143 at 9. The August 2, 1999 order also expanded the reach of an earlier preliminary injunction to include seven other timber sales identified in the plaintiffs' amended complaint, but again did not include Jack Heli. <u>ONRC Action</u>, 59 F. Supp. 2d at 1097; <u>see</u> PX 143 at 12.

On August 5, 1999, ONRC Action filed a motion for a temporary restraining order and preliminary injunction to prohibit the Forest Service and BLM from approving a plan of operations for additional timber sales, including Jack Heli. DX 204; Tr. 140-42, 1899-1901. The Government presented "no arguments in opposition to plaintiff's motion for preliminary injunctive relief." PX 295A.

On August 26, 1999, the district court expanded the August 2, 1999 ruling and enjoined the Forest Service and Bureau of Land Management from approving any plan of operations for, or proceeding with, the operation of 25 timber sales, including Jack Heli. Stip. ¶ 16.

Ted Boling recommended that the Government not appeal the August 26 <u>ONRC Action</u> decision because he believed the likelihood of success was "not great" in light of the tension between the agencies' interpretation of the Record of Decision and the plain meaning of "implement." PX 154 at 6-7.

**<u>The Initial Suspension of Jack Heli</u>**

Following the <u>ONRC Action</u> injunction, the Forest Service notified Timber Products to "suspend all operations immediately on Jack Heli Timber Sale, Contract No. 060715" by letter dated August 27, 1999. Stip. ¶ 18; JX 19. While Timber Products had begun felling timber on or around August 14, 1999, it had not yet removed any of the felled timber when the contract was suspended on August 27, 1999. JX 24; Tr. 1464-65.

On September 14, 1999, Ted Boling advised the Forest Service that it was unlikely that ongoing settlement negotiations would excuse the Forest Service from having to perform surveys on the suspended sales. PX 147A at 3. Even though "some in the Forest Service have decided that we should not undertake any survey effort," and wait for the Supplemental EIS to make some changes to the survey program, Mr. Boling recommended that the Forest Service "get rolling ASAP on survey protocols and surveys for the current and coming survey seasons." <u>Id.</u>

On September 27, 1999, the District Court modified the injunction pursuant to a stipulation between the Forest Service and ONRC Action. JX 26, Tab D at 2621. The stipulation permitted the removal of previously felled timber from the Jack Heli site as well as the removal of debris blocking culverts, the reshaping of cut banks, and the reseeding of soil. <u>ONRC Action v. U.S. Forest Serv.</u>, No. C98-942WD (W.D. Wash., Sept. 27, 1999). The

stipulation limited all yarding activities to helicopter transport from November 1, 1999, to May 1, 2000, and stated that hauling could not occur on non-paved Forest Service roads. Id. On September 29, 1999, the Forest Service authorized Timber Products to proceed with these limited operations. JX 26, Tab D at 2621.

Despite the stipulation allowing limited operations on the Jack Heli sale, Timber Products had difficulty scheduling its helicopter yarding contractor to remove the downed logs until spring of 2000. PX 237, 239. On December 17, 1999, Mr. Turner informed Mr. Matthews:

> After the agreement that would allow us to remove the timber that was on the ground was reached, we again had to try and get Croman [Corporation] to reschedule their helicopter plans to try and get back to this sale. By the time that they could get to this area the snow settled in making the conditions impossible to cleanly log the sale.

PX 237. Mr. Turner explained that "[h]elicopters are difficult to schedule," and advised Mr. Matthews that Timber Products intended to retrieve the timber when the snow melted in the spring. Id. Timber Products removed the downed material in two operations, removing the pine beginning on May 26, 2000, and completing this process on July 25, 2000. JX 26, Tab D at 2621.

## The Continued Suspension of Jack Heli Pursuant to the ONRC Settlement Agreement

In November 1999, the Government settled with the ONRC Action plaintiffs and submitted a settlement agreement to the District Court for approval on November 23, 1999. PX 155. Pursuant to the settlement agreement, the ONRC Action complaint was dismissed and the injunction, dissolved. Id. The Forest Service agreed to continue its suspensions of all affected timber sales, including Jack Heli, until applicable Category 2 surveys were completed, the Forest Service issued Supplemental Information Reports ("SIRs")[9] for the surveys, and the ONRC Action plaintiffs had been given an opportunity to review and object to the SIRs. Id.; JX 26, Tab D at 2621-22.

On December 6, 1999, CO Matthews sent a letter to Bill Turner indicating that surveying of the fungi on Jack Heli had not yet commenced and that "[Forest Service] botanists are not familiar with these species and . . . need to hire skilled mycologists to conduct the surveys." PX 233. CO Matthews added that the Forest Service "has completed the required fall surveys for all of the Survey and Manage species except the above mentioned fungi." Id. at 2.

On July 24, 2000, a Supplemental Information Report was completed for seven of the 25 Jack Heli units. JX 27 at 1. The Forest Service stated it had been unable to complete SIRs for

---

[9] SIRs are regularly produced pursuant to 40 C.F.R. 1502.9(c)(1)(ii): "Agencies shall prepare supplements to either draft or final environmental impact statements if . . . (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

the remaining 18 locations because these were "located at higher elevations and snow prevented the completion of the required fungi surveys." Id. The July 2000 SIR stated that no protected species were found in the seven units surveyed. Id. at 2. Pursuant to the settlement agreement, the July 2000 SIR was sent to the ONRC Action plaintiffs on July 24, 2000, and they promptly objected to the Forest Service's decision to proceed. JX 26, Tab D at 2622. However, the ONRC Action plaintiffs withdrew their objection on August 10, 2000, and the Forest Service notified Timber Products by letter dated August 17, 2000, that the suspension was lifted for seven of the Jack Heli units. Id. Timber Products received the letter on August 21, 2000, the last day of the operating season for 2000, preventing Timber Products from commencing operations at this time. JX 28.[10]

## The Continued Suspension of Jack Heli Due to Further Litigation

Before the suspensions were lifted on the remaining 18 Jack Heli units, and before Timber Products could commence operations on the seven unsuspended units, litigation again derailed the process. On December 7, 2000, a preliminary injunction was entered in Pacific Coast Federation of Fishermen's Associations v. National Marine Fisheries Service, ("PCFFA III") No. C00-1757R (W.D. Wash, Dec. 7, 2000). The order required the suspension of 20 biological opinions, one of which was the biological opinion for Jack Heli. PX 250. On December 12, 2000, the National Marine Fisheries Service notified the Forest Service of the injunction. Id. Without an active biological opinion, the sale no longer complied with the Forest Service's obligations under the Endangered Species Act. Id. On January 12, 2001, the Forest Service notified Timber Products of the injunction and continued suspension. Id.; PX 252.

## Lifting the Suspension and Completing the Contract

On March 17, 2003, the National Marine Fisheries Service permanently withdrew the 20 biological opinions covered under the PCFFA III injunction and on March 25, 2003, the PCFFA III injunction was dissolved. PX 257. On April 4, 2003, the Forest Service notified Timber Products that the Jack Heli suspension would continue until the Forest Service could prepare a new biological opinion in consultation with the National Marine Fisheries Service. Id. The Forest Service stated that it anticipated that the process would be completed by May 2003. Id.

Upon receipt of the Forest Service's notice, Timber Products sought a mutual cancellation of the contract. Citing "dramatic changes in markets and overall economic conditions," Timber Products proposed that the Forest Service:

1. Agree to modify the contract to reduce the cost of operations through logging systems changes, slash treatment options, slash deposit options or unit adjustments;

2. Extend the contract until the market rebounded to "reasonable" levels; or

3. Agree to a no-cost mutual cancellation of the sale.

---

[10] The operating season for the year 2000 extended from May 15, 2000 until August 21, 2000. JX 28.

PX 258 at A-1234 to A-1235; PX 265 at A-1287 to A-1288.  The Forest Service rejected Timber Products' proposal.  PX 259, 260; Tr. 1495-96, 1498-1501, 1504-05.

On August 1, 2003, the Forest Service lifted the Jack Heli suspension and notified Timber Products that the new biological opinions had been approved and that operations could proceed on Jack Heli.  PX 262.  With an exception for the limited removal of previously felled timber in mid-2000, Timber Products had been unable to operate the Jack Heli site for three years and 349 days due to the Forest Service's suspension of the sale.

After the suspension was lifted, Timber Products was unable to immediately operate the Jake Heli site due to difficulties in scheduling helicopter logging on short notice.  PX 263.  In 2005, Timber Products renewed its efforts to mutually cancel the contract.  PX 265, 267.  The Forest Service again rejected Timber Products' proposals.  PX 266, 267, 269; Tr. 1509-12.

Timber Products participated in a second pre-operations meeting in 2005.  Mr. Turner testified that the Jack Heli sale "was now uneconomic" for Timber Products.  Tr. 1517.  Timber Products began harvesting operations in 2005 and completed harvesting, slash, and other clean-up operations in 2007.  See id. at 1517-18.

**Blue Stain**

A fungus known as "blue stain" affected some of the pine trees that Timber Products logged in August 1999, but could not remove until 2000.  Tr. 1519-20.  A tree that dies while still standing may begin turning blue from blue stain, or a tree that was alive when it was felled may contract blue stain if the tree is subsequently cut into logs and not moved.  In such circumstances, the logs have "just a saw cut" between them such that there is a "warm moist area, which is the perfect medium" for development of blue stain.  Id.  Mr. Turner testified, "[t]he spores get in there, and then the stain goes into the log.  It turns what was bright wood a blue color . . . ."  Id. at 1520.  In its claim, Timber Products stated that "7.15 MBF of pine logs which were removed [in the spring of 2000] suffered from blue stain resulting in a loss of 1/3 of their value."  JX 26A at 2545.

**Timber Products' Certified Claim**

On July 14, 2000, Timber Products submitted a CDA claim for damages due to the suspension of Jack Heli.  Stip. ¶ 30.  The claim sought both lost profits and out-of-pocket expenses incurred as a result of the suspension.  JX 26, Tab A.  The CO issued a final decision on November 9, 2000, and denied Timber Products' claim in its entirety.  Stip. ¶ 34; JX 26, Tab D; Tr. 1483, 1876.[11]

---

[11]  On August 24, 2005, and June 13, 2007, Timber Products submitted supplements to its CDA claim with additional backup documentation.  JX 26, Tabs G and H.

## Discussion

### Jurisdiction and Legal Standards

Plaintiff brings this claim under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7104(b)(1).  The Tucker Act, 28 U.S.C. § 1491(a)(2), establishes this Court's jurisdiction over such claims.  In accordance with the CDA, the Court reviews the contracting officer's decision de novo. 41 U.S.C. § 7104(b)(4).

Contract interpretation is reviewed as a matter of law, and the Court gives no deference to the interpretation adopted by the agency.  Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997).  Where the United States is a party to the contract, the Court of Federal Claims applies general rules of contract interpretation, giving the terms of the contract "their customary and accepted meaning."  Scott Timber Co. v. United States, 333 F.3d 1358, 1366 (Fed. Cir. 2003) (citing Alaska Lumber & Pulp v. Madigan, 2 F.3d 389, 392 (Fed. Cir. 1993)).

In addition to obligations expressly set forth in the text of a contract, every party to a contract owes a common law "covenant of good faith and fair dealing" to its contracting partner.  Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  This implied duty obligates parties to act "with good faith and fair dealing in [their] performance and in [their] enforcement" of the contract.  Restatement (Second) of Contracts § 205 (1981).  A party must refrain from doing anything "'that will hinder or delay the other party in performance of the contract'" or that will destroy the other party's reasonable expectations regarding the fruits of the contract.  Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (quoting Luria Bros. v. United States, 177 Ct. Cl. 676, 708 (1966)); Centex, 395 F.3d at 1304.  Promises of cooperation and positive performance exist "in every Government contract, including timber sale contracts."  H.N. Wood Prods., Inc. v. United States, 59 Fed. Cl. 479, 486 (2003).  The duty of good faith and fair dealing encompasses the duties to cooperate and not hinder contract performance.

### Suspension Authority Under Clause C6.01

Clause C6.01, entitled "Interruption or Delay of Operations," states in pertinent part:

Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:

* * *

(b) To comply with a court order, issued by a court of competent jurisdiction;

* * *

Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (i) Contract Term

> Adjustment pursuant to B8.21, or (ii) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to B8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision.  Out-of-pocket expenses do not include lost profits, attorney's fees, replacement cost of timber, or any other anticipatory losses suffered by Purchaser.

JX 15 at 449/49.

The United States Court of Appeals for the Federal Circuit examined an identically-worded provision and determined that the clause expressly authorizes the Forest Service to suspend contracts to comply with a court order.  Precision Pine & Timber, Inc. v. United States, 596 F.3d 817 (Fed. Cir. 2010), reh'g and reh'g en banc denied, June 10, 2010, cert. denied, 131 S. Ct. 997 (2011).  In Precision Pine, the Circuit determined that such a clause gave the Forest Service authority to "unilaterally suspend operations under any contracts with the [CT 6.01] clause."  596 F.3d at 828 (quoting Scott Timber, 333 F.3d at 1366).  Accordingly, this Court concludes that the Forest Service was authorized to suspend the Jack Heli contract in order to comply with the court order in ONRC Action.

This does not end the matter as the Court must assess whether Clause C6.01 limits the Government's monetary liability for the suspension to reimbursement of out-of-pocket expenses. As the Court of Federal Claims recognized in Scott Timber:

> The suspension authority contained in CT6.01 does not remove all liability subject only to the limited relief allowed by the provision.  As the Federal Circuit's decision in Scott Timber holds, the government's failure to comply with a legally binding obligation could engender a breach of contract notwithstanding the suspension authority set forth in CT6.01.  The Forest Service's failure to comply with such an obligation could produce a suspension or continued suspension that was unreasonable and thus constitute a breach of the covenant of good faith and fair dealing or the closely related duties to cooperate and not hinder performance.

86 Fed. Cl. at 112 (citations omitted).

Further, as this Court recognized in its opinion denying summary judgment, the Federal Circuit and its predecessor have declined to apply these types of limitation of liability clauses where the Government's own unreasonable conduct caused a delay or suspension.  Blue Lake Forest Prods., Inc. v. United States, 86 Fed. Cl. 366, 378 (2009) (citing Scott Timber Co. v. United States, 333 F.3d 1358 (Fed. Cir. 2003); Ozark Dam Constructors v. United States, 130 Ct. Cl. 354, 360 (1955); George A. Fuller Co. v. United States, 108 Ct. Cl. 70 (1947)). "The overarching principle is [that] the Government cannot limit its liability if it acted unreasonably, failed to cooperate with, or hindered its contracting partner in the performance of its contractual undertaking."  Blue Lake, 86 Fed. Cl. at 378.  See also Trinity River Lumber Co. v. United States, 66 Fed. Cl. 98, 108 (2005) (stating that "implied duties prevent the Forest Service from suspending contracts indefinitely [under C6.01] in order to comply with a court order if its own

unreasonable or wrongful actions caused the order to be imposed, or if it unreasonably delayed in remedying the offending circumstances"); H.N. Wood Prods., 59 Fed. Cl. at 487.

**The Implied Duties to Cooperate and Not Hinder Performance**

Plaintiff asserts that the Forest Service breached its duties to cooperate and not hinder performance because it did not inform Timber Products that Jack Heli was on ONRC Action's "at risk" lists, and awarded Jack Heli to Timber Products, without addressing the sale's status with respect to the ONRC Action litigation.  Plaintiff argues that the Forest Service purposely allowed Timber Products to incur costs to build roads and otherwise prepare for logging operations which the Forest Service knew were highly likely to trigger a motion for injunctive relief, and an ensuing injunction and suspension.

Plaintiff posits that the legal standard for assessing whether the government breached the implied duties to cooperate and not hinder performance is whether the government acted reasonably in awarding and suspending its timber contract, citing Scott Timber v. United States, 333 F.3d 1358 (Fed. Cir. 2008).  In Scott Timber, the Federal Circuit applied the reasonableness test in considering whether the Forest Service's suspension of several contracts to pursue consultation on the murrelet -- a recently listed endangered animal -- constituted a breach of the implied duties to cooperate and not hinder performance.  333 F.3d at 1368 (citing Scott Timber, 40 Fed. Cl. at 502; Thomas Creek Lumber & Log Co. v. United States, 32 Fed. Cl. 787, 790 (1995)).[12]

The reasonableness standard articulated in Scott Timber, with reliance on Thomas Creek, harks back many decades.  Though the Thomas Creek court did not expressly consider the implied duties, it recognized that the government's discontinuation of timber harvesting to accommodate endangered species had to be "reasonable."  Recognizing that under the Thomas Creek contract, the discontinuation of harvesting was left to the discretion of the agency, the court there noted:

> It is a well-established principle of law that a 'party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously.'  American Export Isbrandtsen Lines, Inc. v. United States, 204 Ct. Cl. 424, 465 (1974) (quoting Pacific Far East Line, Inc. v. United States, 184 Ct. Cl. 169, 184 (1968)).  Hence the court must determine whether the authorized BLM officer acted reasonably in his disputed decisions to suspend harvesting on the [timber sale] contract site and to delay authorizing the resumption of harvesting on the [timber sale] contract sites.

Id. (emphasis added).  In American Export, referenced above in Thomas Creek, the Court of Claims recognized that when parties enter into a contract they both "implicitly covenant not to act in an arbitrary or capricious manner in their dealings with each other under the contract.  Any

---

[12]  Ultimately, the Federal Circuit in Scott Timber found that the reasonableness of the Government's conduct could not be determined on summary judgment, as it was an intensely factual inquiry.  333 F.3d at 1370.

such action would amount to a clear abuse of the discretion granted to each party under the contract." American Export, 204 Ct. Cl. at 467; see also, C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1542 (Fed. Cir. 1993); George A. Fuller Co, 108 Ct. Cl. at 94; Luria Bros, 177 Ct. Cl. at 688.

Defendant, relying on Precision Pine, submits that the legal standard for assessing whether the government breached the implied duties to cooperate and not hinder performance is whether the government: (1) took an action "specifically targeted" at Plaintiff, and (2) "reappropriate[d] the benefits [Plaintiff] expected to obtain from the transaction, thereby abrogating the government's obligations under the contract." 596 F.3d at 829-30.

The "specifically targeted" standard in the cases relied upon by the Precision Pine court -- First Nationwide and Centex -- was articulated in the context of analyzing whether the government action, there the Guarini legislation, was a sovereign act -- a general and public act of broad application taken by the sovereign in its sovereign, governmental capacity -- the type of act which would have defeated Government's liability. See First Nationwide Bank v. United States, 431 F.3d 1342 (Fed. Cir. 2005); Centex, 395 F.3d at 1307. Under the sovereign acts doctrine, the Government cannot be held liable for an obstruction to the performance of a particular contract resulting from the Government's public and general acts as a sovereign. Horowitz v. United States, 267 U.S. 458, 461 (1925); Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1574 (Fed. Cir. 1997).[13]

The sovereign acts doctrine attempts to "balance[] the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor." United States v. Winstar Corp., 518 U.S. 839, 896 (1996). This balancing "is not a hard and fast rule, but rather a case-specific inquiry that focuses on the scope of the [Governmental act] in an effort to determine whether, on balance, that [act] was designed to target prior governmental contracts." Yankee Atomic Elec., 112 F.3d at 1575 (emphasis added). Thus, the "specifically targeted" language in First Nationwide and Centex was articulated in the context of resolving the Government's sovereign acts defenses, and was not broadly asserted as replacing the reasonableness standard for determining whether there was a breach of the implied duty of good faith and fair dealing. See Centex, 395 F.3d at 1307 (noting that the sovereign acts doctrine does not apply to "legislation targeting a class of contracts to which the government is a party"). Given its reliance on Nationwide and Centex, Precision Pine should not be interpreted as creating a wholly new standard, and displacing the well entrenched reasonableness standard for determining whether there was a breach of the implied duties.

Precision Pine did not purport to overrule or depart from Scott Timber, American Export, Sanchez, Fuller or Malone v. United States, 849 F.2d 1441 (Fed. Cir. 1988). As the Court of Federal Claims recognized in Fireman's Fund Insurance Company v. United States, 92 Fed. Cl. 598 (2010), "Precision Pine does not foreclose consideration of whether [the government]

---

[13] So too, under the unmistakability doctrine, "[i]n the absence of unmistakable contractual language to the contrary, general tax legislation would not give rise to contractual liability simply because the tax had an adverse impact on the government's contracting partners." Centex, 395 F.3d at 1310.

breached its contractual duty of good faith and fair dealing based on the standards set forth in Malone and its progeny." 92 Fed. Cl. at 677-78 (citing Malone v. United States, 849 F.2d 1441 (Fed. Cir. 1988)). In short, the Fireman's Fund court found the reasonableness standard was not changed by Precision Pine, stating:

> The Government breaches [the covenant of good faith and fair dealing] when it acts unreasonably under the circumstances, viz., if it unreasonably delays the contractor or unreasonably fails to cooperate. See C. Sanchez & Son, 6 F.3d at 1542 ("The government must avoid actions that unreasonably cause delay or hindrance to contract performance."); Commerce Int'l Co. v. United States, 167 Ct. Cl. 529, 338 F.2d 81, 86 (1964) (determining that "breach of [the] obligation of reasonable cooperation" depends upon [the] "particular contract, its context, and its surrounding circumstances").

> Precision Pine, the Federal Circuit's most recent explication of the implied duty of good faith and fair dealing, does not change the standards cited above.

92 Fed. Cl. at 675-76.

In addition to holding that Precision Pine does not foreclose the use of the reasonableness standard for determining breaches of the implied duty of good faith and fair dealing, the Fireman's Fund court limited the "specifically-targeted" test articulated in Precision Pine to its context: "a situation where the Government's alleged wrongful conduct does not arise directly out of the contract, i.e., key to the alleged breach are actions involving another government actor or a third party." 92 Fed. Cl. at 677.

Fireman's Fund involved a construction contract, and its facts required the application of both the general rule of reasonableness and the "specifically targeted" rule of Precision Pine. The plaintiff asserted that the Army Corps of Engineers ("Corps") breached its implied duty of good faith and fair dealing by failing to respond to a request for information in a timely manner, and delaying and interfering with its site re-watering plans. 92 Fed. Cl. at 678, 680. For both of these claims, the Fireman's Fund court engaged in a reasonableness analysis because allegedly wrongful actions by the Corps implicated duties directly flowing from the contract at issue. Id. at 679, 683-84.

However, the Fireman's Fund plaintiff also claimed that the Corps breached its implied duty of good faith and fair dealing by issuing a modification of $22.4 million under a different contract to a different contractor in the same geographic area, to allow recruitment of both union and non-union labor. Id. at 631-33. The plaintiff in Fireman's Fund claimed that this modification adversely affected its contract by distorting the local labor market and impeding the plaintiff's ability to recruit labor. Id. at 662. In analyzing this claim, the Fireman's Fund court applied the Precision Pine specifically-targeted test because alleged wrongful government conduct did not arise directly out of the Government's contract with the plaintiff. Id. at 661. The Fireman's Fund court noted that, in Precision Pine, the breach was not of a duty owed to the plaintiff, but to a third party under a statute. Id. at 677-78. In Precision Pine, the plaintiff alleged that the Forest Service breached its duty under the Endangered Species Act to consult

with the Fish and Wildlife Service to ensure that any action "authorized, funded or carried out by such agency [was] not likely to jeopardize the continued existence of any endangered species." 596 F.3d at 821, 830 (quoting 16 U.S.C. § 1536(a)(2) (2006)).  The Precision Pine court noted that while the Forest Service violated its obligations under the Endangered Species Act to the Fish and Wildlife Service, such breach of a duty to a third party "did not, without more, violate the duty of good faith and fair dealing owed to Precision Pine." Id.

Unlike Precision Pine, the Forest Service's obligations here ran directly to Timber Products under the Jack Heli contract, not to a third party under a statute or a different contract, and the alleged breach directly impacted Timber Products' ability to perform under this contract. As such, the Scott Timber reasonableness standard, not Precision Pine's specifically-targeted standard, applies.

## Was the Government's Conduct Reasonable?

As the Scott Timber court recognized, "a determination whether the Forest Service's actions in suspending the contracts were 'reasonable' involves a fact-intensive inquiry into the circumstances surrounding the award of the contracts, the ONRC Action litigation, and the suspensions and extensions of suspension of Scott Timber's contracts." Scott Timber, 86 Fed. Cl. at 113 (citing Scott Timber, 333 F.3d at 1369).  Following the Court of Federal Claims' analytical construct in Scott Timber, this Court, in reviewing the suspensions, will weigh the Forest Service's delay "relative to the circumstances surrounding why the suspension occurred and the degree of knowledge held by the Government at certain times." Id. (citations omitted).

Plaintiff argues that the Forest Service unreasonably caused the suspensions of the contract by adopting the "NEPA Decision Equals Implementation" interpretation of the Record of Decision, and by awarding its timber sale and authorizing ground-disturbing activities without conducting environmental surveys as required by statute.  Further, according to Plaintiff, by concluding that implementation actually occurs when the NEPA decision is issued, the Forest Service arbitrarily exempted sales for which NEPA decisions had been issued but ground-breaking activities had not yet commenced.

In granting a preliminary injunction, the District Court in ONRC Action determined that the "NEPA Decision Equals Implementation" interpretation was "arbitrary and contrary to the plain language of the ROD." ONRC Action, 59 F. Supp. 2d at 1093.  The Government itself recognized that this interpretation was tenuous, but nonetheless proceeded to award timber sales justified by this interpretation.  Assistant Attorney General Schiffer characterized this interpretation as "nonsense." PX 98 at A-498; PX 91 at A-504.  Mr. Boling, counsel for the Government in ONRC Action acknowledged that "[t]he agency's interpretation of the ROD is difficult to square with the common meaning of the term 'implemented.'" PX 90 at 501; Tr. 172-73; PX 167A at 98-101.  Tom Hussey, a Forest Service Policy Planner, testified that "out of the context of the Northwest Forest Plan Survey and Manage language, I think most folks would say implementation occurs when you go out and actually do physical operations on the ground." Tr. 1112. Nevertheless, the Forest Service adopted the "NEPA Decision Equals Implementation" interpretation, which resulted in the exclusion of a number of sales from the survey requirements. PX 169A at 738-39.

27

Defendant argues that Plaintiff cannot establish a breach of the implied duties here because the adoption of the "NEPA Decision Equals Implementation" interpretation occurred before award, and a breach of the implied duties cannot be predicated on pre-award conduct. Defendant points to the language in <u>Precision Pine</u> stating, "[b]ecause the suspensions were authorized, the only remaining question is whether the Forest Service's actions <u>during the suspensions</u> violated the implied duty of good faith and fair dealing." <u>Precision Pine</u>, 596 F.3d at 828 (emphasis added). According to Defendant, "the Forest Service's pre-contract conduct is wholly irrelevant to the question of whether the Forest Service breached the implied duty of good faith and fair dealing as it relates to the Jack Heli timber sale contract." Def.'s Suppl. Br. 3-4 (citing <u>Baker v. United States</u>, 50 Fed. Cl. 483, 499 (2001) (the Government owed no duty in accordance with the duty of good faith and fair dealing when "any conduct in violation of statutes and rules . . . occurred prior to the formation of a contract")).

Defendant ignores the fact that in this case the "NEPA Decision Equals Implementation" interpretation did not -- as an isolated statutory violation might -- begin and end before award. Rather, that interpretation infected the decision to award the Jack Heli sale. That interpretation <u>was</u> the government action that sanctioned awarding the sale without performing requisite surveys. That interpretation, preaward, at award, and post-award, dictated the misguided government conduct that constituted the breach of the implied duties until that interpretation was finally put to rest by the District Court in <u>ONRC Action</u>.

As the court in <u>Scott Timber</u> recognized, a breach of the implied duty of good faith and fair dealing may occur "as" a contract is awarded. 86 Fed. Cl. at 117. The <u>Scott Timber</u> court explained:

> The government's arguments do not address whether a breach of the covenant of good faith and fair dealing could occur as the contract was awarded. . . . Although <u>Scott Timber</u> was, as plaintiff concedes, primarily about the reasonableness of "prolonging the duration of a suspension," . . . the Federal Circuit in that case did not decide that actions prior to the contract award were not to be taken into account in assessing reasonableness. Instead, the court of appeals did take into account the Forest Service's pre-award actions and decisions in evaluating the reasonableness of contract suspensions initiated by the Forest Service. <u>See</u> 333 F.3d at 1368-70 (using the Forest Service's pre-award knowledge regarding murrelet habitats and the likelihood that the murrelet would be declared a "threatened species" as evidence of the unreasonableness for contract suspensions). In assessing reasonableness, the court of appeals observed that "'[i]t is a well-established principle of law that a party vested with contractual discretion must exercise his discretion reasonably.'" <u>Id.</u> at 1368 (quoting <u>Scott Timber v. United States</u>, 40 Fed. Cl. 492, 502 (1998)). Such an inquiry into the reasonable exercise of discretion can extend to actions that were performed prior to, or at, the contract award, and is not limited to an evaluation of the duration of the contract suspension. As a result, in evaluating the Forest Service's reasonableness, the court will consider circumstances surrounding the suspension of the contracts and the relative degrees of knowledge held by Scott Timber and the Forest Service prior to and at the award of the contracts.

86 Fed. Cl. at 117-18.  Here, as in <u>Scott Timber</u>, the Government's offending conduct was a continuum -- beginning with the ill conceived adoption of the "NEPA Decision Equals Implementation" interpretation and continuing with awarding timber sales without doing surveys in reliance on that interpretation.  In short, the Government's conduct that hindered Plaintiff's ability to perform began prior to award and continued throughout the contract.

## The Government Failed To Articulate A Rational Basis for Awarding the Jack Heli Sale

Plaintiff alleges that the Government breached its implied duty of good faith and fair dealing by awarding the contract despite knowledge that pending litigation could threaten the parties' ability to pursue performance.

The rationale for the Government's decision to award Jack Heli on March 2, 1999, is puzzling.  The record does not suggest that the <u>ONRC Action</u> plaintiffs had agreed to refrain from seeking injunctive relief with respect to Jack Heli.  In contrast, DOJ attorney Boling recognized that the award of Jack Heli could prompt a request for injunctive relief in <u>ONRC Action</u> and even notified plaintiffs' counsel that award of timber sales that "may be of concern to [his] client were being made, beginning with . . . Jack Heli."  PX 202.  Litigation coordinator Zike acknowledged that "the Forest Service was proceeding even though there [was] some risk of prompting preliminary injunctions with the awards."  DX 18 at 1811.  The decision to award was not based on the environmental parameters of the Jack Heli sale, even though on October 28, 1998, Ms. Zike had informed her contacts in the Forest Service that if timber sales were to proceed, "good reasons (resource reasons)" would have to be shown.  PX 75 at A-434.  The only discernable reason for awarding the sale in March 1999, was not a resource reason -- such as the species likely to be found on the sale area or the nature or extent of ground-disturbing activities planned -- but was a tactical decision in the <u>ONRC Action</u> litigation.

After settlement negotiations with the <u>ONRC Action</u> plaintiffs broke down in December 1998, DOJ was no longer bound by an agreement to refrain from awarding certain sales.  Then, the litigation coordinator advised there was a "window of opportunity' to award sales.  In a February 6, 1999 email, Ms. Zike described the so-called "window of opportunity."  The Government had prevailed on its first motion to dismiss <u>ONRC Action</u>, but expected the plaintiffs would file an amended complaint.  Ms. Zike explained that the Government believed it "would not have the risk of prompting a motion for preliminary injunction until [the <u>ONRC Action</u> plaintiffs] got their amended complaint in the hopper."  Tr. 595.  Of course, this strategy did not eliminate or diminish any long-term risk in awarding sales, it merely allowed sales to go forward until the <u>ONRC Action</u> plaintiffs were poised to seek injunctive relief, after amending their complaint.  Awarding the sales and then defending motions for injunctive relief would, in Ms. Zike's words, enable the Government to bring purchasers like Timber Products "squarely to the table" to aid the Government in defending against potential injunctions.  PX 99 at A-1754.  The purchasers could help oppose injunctive relief by showing harm to third parties due to the disruption and costs an injunction would have on their sales.  In short, awarding the timber sales was a litigation tactic.  The Government also expressly recognized that this tack might result in damages in actions by purchasers.  <u>Id.</u>; PX 109 at 1798.

As noted above, a party vested with contractual discretion "must exercise his discretion reasonably and may not do so arbitrarily or capriciously." Thomas Creek, 32 Fed. Cl. at 790. The Court of Federal Claims explained: "Under this narrow scope of review, the court does not weigh evidence relating to the agency determination or substitute its judgment for that of the agency, but rather considers whether the agency has articulate[d] a rational relationship between the facts found and the choice made." Reservation Ranch v. United States, 39 Fed. Cl. 696, 715 (1997) (citation omitted); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("[T]he test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."). Here, the Government has not articulated a rational basis for its decision to award the Jack Heli sale when the sale was at risk of being enjoined. If anything, the record suggests that the Government forged ahead with the Jack Heli award at a very precarious time -- the ONRC Action litigation was heated, the Jack Heli site had recently been put back on the at-risk list after having been inadvertently removed, and DOJ was lining up its agency counsel and bringing purchasers like Timber Products "squarely to the table" to defend against requests for injunctive relief.

## The Government Failed to Inform Plaintiff That The Jack Heli Sale Was At Risk Of An Injunction

The Government's breach of the implied duties to cooperate and not hinder here was not confined to its decision to award despite the likelihood of an injunction. Rather, the Government also breached these duties by awarding without informing Timber Products of the known risks of an injunction. After settlement negotiations broke down, the DOJ attorneys and the agencies were gearing up to defend motions for injunctive relief. As Mr. Boling testified, DOJ "wanted to know before it happened when the award would happen" and wanted to make sure "that our agency co-counsel were prepared to assist us if we needed to, on fairly short notice, respond to a TRO or preliminary injunction motion from the Plaintiffs." Tr. 156-57. Yet the Government never informed Timber Products of this risk at the time of award. Mr. Turner was under the impression previously conveyed by Contracting Officer Matthews and Contract Specialist Cox that any award would have DOJ's blessing. In Mr. Turner's view this meant that the Jack Heli sale was not at risk. In his words, the award and contract provisions meant that "the Forest Service is representing that they've done all the work necessary to allow us to harvest the timber from the timber sale and that's why they went about selling it at that point." Tr. 1545.

The Court recognizes that the prospectus given to potential bidders back in September 1998, "identified" the Jack Heli sale in connection with the ONRC Action lawsuit. However, this prospectus did not put bidders on notice that this particular sale was at risk of an injunction. The prospectus for Jack Heli alerted potential bidders to the ONRC Action litigation, stating: "This sale has been identified in a lawsuit in which plaintiffs contend that [the Forest Service] has violated the Northwest Forest Plan in preparing the sale. Language in this sales contract has been included to limit Government's liability in case of cancellation to the holding costs." PX 219; Tr. 1560-61. Aside from the fact that the prospectus did not explain that such amorphous "identification" could result in a suspension of the sale, much had occurred in the 18 months since that prospectus had been disseminated.

The prospectus was disseminated when the sale was advertised on September 25, 1998, but bids were not opened until November 3, 1998. Although on November 3, Timber Products was the high bidder -- the presumed awardee -- DOJ pulled the plug on the award because ONRC Action put Jack Heli back on the at-risk list. The Government did not inform Timber Products that Jack Heli was on an at-risk list. On November 24, 1998, Bev Cox, a contract specialist for the Forest Service, notified Bill Turner of Timber Products that the Forest Service could not make award of Jack Heli "until the Justice Department says we can." PX 232 at 2372. At about the same time, Mr. Turner requested a "copy of [the] suit" that was the reason for the delay in contract award and Ms. Cox mailed a copy of the ONRC Action complaint to him. Id.; Tr. 1531. Mr. Turner briefly reviewed the complaint, but did not seek any further information about it at the time because he understood that the Forest Service would not award Jack Heli until it had taken care of whatever was the cause of the delay in contract award. Tr. 1428-30, 1531-32.

Mr. Turner had several conversations with CO Matthews about the status of the Jack Heli sale as months passed and the contract had still not been awarded. Tr. 1428-33, 1436-38. In January 1999, Mr. Turner asked CO Matthews for a formal written communication regarding the status of the sale. JX 12; Tr. 1430-31. CO Matthews responded by letter of January 21, 1999, in which he stated: "The forest is presently preparing information documents for presentation to government attorneys indicating that we want to proceed with award of the sale. It is also my understanding that government attorneys have filed for dismissal of the case. . . . I do not know when award of the sale will be approved but I do not expect to have anything resolved before early February." PX 221; Tr. 1430-32.

Mr. Turner understood from CO Matthews' January 21, 1999 letter and his other communications with CO Matthews and Contract Specialist Cox that "they were getting this timber sale removed from the lawsuit," Tr. 1432-33, and that "they were trying to remove this sale from the lawsuit and would not award it until it was removed." Id. at 1564. When the sale was finally awarded on March 2, 1999, over five months after it was advertised, Timber Products reasonably believed the sale was awarded with DOJ's approval and was not going to be the subject of an injunction. As Mr. Turner testified, "and the delay in award, that's because they were still dotting I's and crossing T's. But the contract as a whole speaks to the fact that now you can go ahead, Timber Products Company, and operate this timber sale." Tr. 1545.

Here, as in Scott Timber, "[t]he specific risk relating to the ONRC Action litigation was never relayed" to the purchaser. 86 Fed. Cl. at 118. Because of the knowledge the Government had at the time of award that Timer Products did not have -- that negotiations had broken down, Jack Heli was very much an at-risk sale and the Government was anticipating defending motions for injunctive relief -- it was unreasonable for the Forest Service to award the Jack Heli sale to Timber Products "without informing it of the specific risks to its [contract] from the ONRC Action litigation." Scott Timber, 86 Fed. Cl. at 118.

Also as in Scott Timber, the Forest Service's unreasonable actions here amounted to a breach of its implied duties to cooperate and not hinder performance. In order to demonstrate a breach of these duties, Timber Products is not required to demonstrate that the Forest Service was acting with express malice or bad faith. Rather, the Forest Service's violation of these duties

can be inferred from its knowledge of certain risks, its failure to pass on this knowledge to its contracting partner, and the resulting deprivation to the plaintiff of a "substantial measure of the fruits of the contract."  Id. at 117 (quoting Centex Corp., 395 F.3d at 1304).  In Peter Kiewit Sons' Company v. United States, 138 Ct. Cl. 668 (1957), the Court of Claims held that the Government may be liable for delays caused by either negligence or willful misconduct.  138 Ct. Cl. at 674.  As the Peter Kiewit court explained:

> [W]here the Government or its authorized representatives are guilty of some act of negligence or willful misconduct which delays the contractor's performance, the Government is liable for the resulting damages. This is so because there is in every Government contract, as in all contracts, an implied obligation on the part of the Government not to willfully or negligently interfere with the contractor in the performance of his contract.

Id. (internal citations omitted).  Timber Products is entitled to damages in an amount to be determined in future proceedings based on the Forest Service's breach of these duties.

## The Length of the Suspension Was Not Unreasonable

Timber Product's contract was initially suspended on August 27, 1999, as a result of an injunction in the ONRC Action litigation.  JX 19.  The suspension lasted almost four years until August 1, 2003.  PX 262.  Plaintiff argues that, wholly apart from any unreasonable conduct in awarding the contract in the face of the ONRC Action litigation, the Forest Service unreasonably prolonged the suspension by several months.  Pl.'s Post-Trial Br. 82-87.  Plaintiff claims that the unreasonable delay prevented it from operating and completing Jack Heli in Cutting Year 2000 as it had intended.  Id. at 82.

As part of the ONRC Action settlement agreement, the Jack Heli sale was subject to the requirement that the Forest Service conduct Category 2 surveys for the site.  PX 155; JX 26, Tab D at 2621-22.  The Forest Service was required to report these survey results in a Supplemental Information Report to the ONRC Action plaintiffs, who could then object to the surveys.  Id. The ONRC Action settlement occurred on November 23, 1999, and the resulting Category 2 surveys on Jack Heli occurred on the following dates: fungi, December 16, 1999 to November 28, 2000; bryophytes, April 10, 2000 to August 23, 2000; mollusks, November 10, 1999 to June 9, 2000; and vascular plants, April 10, 2000 to August 23, 2000.  PX 193 at 9-10.

On July 24, 2000, a Supplemental Information Report was completed for seven of the 25 Jack Heli units.  JX 27 at 1.  Pursuant to the settlement agreement, this Supplemental Information Report was sent to the ONRC Action plaintiffs and they promptly objected to the Forest Service's decision to proceed.  JX 26, Tab D at 2622.  However, the ONRC Action plaintiffs withdrew their objection on August 10, 2000, and the Forest Serviced notified Timber Products by letter dated August 17, 2000, that the suspension was lifted for seven of the Jack Heli units.  Id.  Timber Products received the letter on August, 21, 2000.  JX 28.  Because August 21, 2000 was the last day of the operating season for 2000, Timber Products was unable to commence operations at this time.  Id.

Plaintiff claims that several failures by the Forest Service unreasonably prolonged this period of suspension, and that absent these failures, "several key months of time could have been gained, and the Jack Heli surveys could have been completed by the Spring of 2000 making the entire sale available to Timber Products for harvesting in the summer and fall of 2000." Pl.'s Post Trial Br. 84.  First, Plaintiff claims that the Forest Service failed to "immediately and diligently perform [Category 2] surveys" after the preliminary injunction was issued on August 5, 1999, in ONRC Action.  Id. at 83.  Plaintiff notes that on September 14, 1999, Ted Boling, the government's chief trial counsel in ONRC Action, advised the Forest Service to begin all applicable Category 2 surveys on the suspended sales because it was unlikely that any settlement in ONRC Action would relieve the Forest Service of this duty.  PX 147A at 3.  The Forest Service did not actually commence the surveys on Jack Heli until November 11, 1999, a delay of almost two months.

The record does not support Plaintiff's contention that the Forest Service acted unreasonably in commencing the surveys when it did.  While recommending that that the Forest Service begin Category 2 surveys in September 1999, Mr. Boling also recognized that "some in the Forest Service have decided that we should not undertake any survey effort" in order to see what impact a pending Supplemental Environmental Impact Statement would have on survey requirements.  PX 147A at 3.  Thus, the Forest Service was faced with two alternatives.  It could have begun conducting surveys in September 1999, with the knowledge such surveys would likely be required as part of the ONRC Action litigation.  However, the pending Supplemental Environmental Impact Statement and the future settlement in the ONRC Action litigation could have changed the required scope of the surveys.  Surveys completed prior to the eventual settlement in ONRC Action or the Supplemental Environmental Impact Statement could have been inadequate, and been required to be redone.  The ONRC Action settlement was finalized on November 23, 1999, and it contained heightened parameters for survey requirements, including giving ONRC Action plaintiffs the right to object to the survey findings.  Thus, the Forest Service's choice to wait to begin the surveys for two months was reasonable.

Second, Plaintiff claims the Forest Service failed to promptly hire "skilled mycologists" to survey the fungi.  On December 6, 1999, CO Matthews sent a letter to Bill Turner indicating that surveying of the fungi on Jack Heli had not yet commenced and that "Forest Service botanists are not familiar with these species [fungi] and we need to hire skilled mycologists to conduct the surveys."  PX 233.  As a result, not all of the fungi surveys required for the fall-winter 1999-2000 seasons could be completed.  Plaintiff argues:

> Defendant has proffered no evidence to explain why Mr. Boling's recommendation was not followed nor any explanation of why the [Forest Service] did not hire skilled mycologists and commence all Category 2 surveys on Jack Heli in August 1999.  If the [Forest Service] had done so, several key months of time could have been gained.

Pl.'s Post-Tr. Br. 84.

As explained above, it was reasonable for the Forest Service to await the parameters of the Supplemental Environmental Impact Statement and final ONRC Action settlement agreement

before commencing surveys.  Moreover, Plaintiff has not articulated a measurable period of delay which can be attributed to the alleged failure to hire mycologists, or a date on which skilled mycologists should have been obtained.  Nor has Plaintiff shown how the delay in surveying the fungi adversely impacted Plaintiff.  Even if the Forest Service had completed the surveys in the timeline Plaintiff proposed, the completion of these surveys would not have caused the Jack Heli suspension to be lifted.  The ONRC Action settlement gave the plaintiffs in that litigation the right to object to the results of the Category 2 surveys.  PX 155.  The ONRC Action plaintiffs exercised this right over the seven Jack Heli units for which surveys were completed in July 2000, further extending the period of Timber Product's suspension.  JX 26, Tab D at 2622.

Third, Plaintiff argues that the Forest Service completed all the required surveys of the Happy Thin site by May 10, 2000, but did not complete all the surveys on Jack Heli until six months later.  Pl.'s Post-Tr. Br. 85; PX 193 at 9-10.  Plaintiff claims that this difference establishes the unreasonableness of the Forest Service's actions with respect to the Jack Heli site because both sales were in the same national forest, were administered by the same CO, and needed the same types of specialists.  Pl.'s Post-Tr. Reply Br. 20.  Although Happy Thin was another timber sale in the Klamath National Forest suspended at the same time as Jack Heli in order for the Forest Service to perform similar surveys, Plaintiff's comparison of the Forest Service's actions at the Happy Thin site does not demonstrate the Forest Service's actions at Jack Heli were unreasonable.  Plaintiff has not shown that the Forest Service had a duty to complete the Jack Heli surveys prior to, or simultaneously with, the Happy Thin surveys, that the Forest Service had or should have had sufficient personnel to perform both projects' surveys at the same time, or that the Happy Thin and Jack Heli sites were at similar altitudes such that the survey timeline at Happy Thin should have approximated the timeline at Jack Heli.  The record indicates that altitude was a factor for surveying 18 of the 25 Jack Heli units.  When the Forest Service completed the first Jack Heli SIR in July 2000, it had been unable to complete surveys at 18 locations because these were "located at higher elevations and snow prevented the completion of the required fungi surveys."  JX 27 at 1.  There is no evidence in the record of similar impediments at Happy Thin.

## Superior Knowledge and Defective Specifications

Plaintiff argues that the Forest Service breached its implied duty to disclose superior knowledge by concealing the status of the Jack Heli sale as it was implicated in the ongoing ONRC Action litigation at the time of award.  Pl.'s Post-Trial Br. 60 (citing S. Cal. Edison v. United States, 58 Fed. Cl. 313, 325 (2003)).  Specifically, Plaintiff asserts that the Forest Service improperly withheld the following information when it awarded the sale to Timber Products: (1) Jack Heli was a named target of ONRC Action; (2) ground-disturbing operations were likely to provoke an application for a TRO or other injunctive relief by ONRC Action; and (3) the Forest Service had weighed the risk of likely injunctive action by ONRC Action, evaluated the strength of the Government's case on the merits and concluded that the risk was worth taking.  Pl.'s Post-Trial Br. 60.  While factually the record bears out what Plaintiff characterizes as the underpinnings of its "superior knowledge" claim, legally this claim is identical to the allegation that Defendant breached the implied duty of good faith and fair dealing and the concomitant duties to cooperate and not hinder performance.  Under these circumstances, this Court agrees with the Scott Timber court that "[a]lthough [the plaintiff] pleads its case under the rubric of

superior knowledge, its claims are more properly evaluated in terms of whether or not the Forest Service was reasonable in awarding contracts in the face of the <u>ONRC Action</u> litigation."  86 Fed. Cl. at 117 (citations omitted).

In a similar vein, Plaintiff argues that design specifications governing ground-disturbing activities authorized by the contract were defective and that the Forest Service breached its implied warranty that the Jack Heli sale could be operated in accordance with those specifications.  Pl.'s Post-Trial Br. 56-60.  Like its superior knowledge claim, this is a restatement of Plaintiff's contention that the Government failed to cooperate and hindered its performance of the timber sale contract, and is not a proper separate legal framework for evaluating its claim.[14]

## Conclusion

Plaintiff's appeal from the Contracting Officer's final decision is granted as to liability consistent with the discussion above.

The Court will conduct a telephonic conference with the parties on **January 31, 2012,** at **11:00 a.m.** to discuss further proceedings regarding damages.

<u>s/Mary Ellen Coster Williams</u>
**MARY ELLEN COSTER WILLIAMS**
**Judge**

---

[14] Even assuming that a defective specification claim can be brought where the Government is the seller, Plaintiff has not demonstrated that the specifications here were defective apart from the Government's failure to perform surveys -- a matter better addressed as a breach of the implied duties.

35